IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DAVID F. POLLOCK, as Executor )
of the Estate of Margaret F. )
Pollock, JOHN T. DIBIASE, JR., )
JOHN S. FRAYTE, PATRICIA L. )
CHRISTOPHER, LOUIS A. VECCHIO )
and BESSIE P. VECCHIO, BARBARA )
A. MORRIS, GENE M. VIRGILI and )
ERIN R. VIRGILI, LLOYD R. SHAFFER, )
III, on Behalf of Themselves )    Civil Action No. 10-1553
and All Others Similarly Situated )
                                  )
          Plaintiffs,             )
                                  )
     v.                           )
                                  )
ENERGY CORPORATION OF AMERICA,    )
                                  )
          Defendant.              )



REPORT AND RECOMMENDATION

I.  Recommendation

        Presently before the Court are the parties' cross
motions for summary judgment (Doc. ## 66, 69).  For the reasons
that follow, it is respectfully recommended that Defendant's
motion be granted in part and denied in part and Plaintiffs'
motion be granted in part and denied in part.


II. Report

    A.  Factual and Procedural History

1

Plaintiffs[1] are Pennsylvania landowners ("Plaintiffs") who entered into oil and gas leases with Defendant, Energy Corporation of America ("ECA"). On March 4, 2011, Plaintiffs filed an amended class action complaint against ECA for alleged underpayment of oil[2] and gas royalties owed under the leases (Doc. # 12.)

On March 28, 2011, ECA filed a motion to dismiss the amended complaint arguing that: 1) the claim that ECA took wrongful volumetric deductions is foreclosed by the Pennsylvania Supreme Court's decision in Kilmer v. Elexco Land Services, 605 Pa. 413, 990 A.2d 1147 (2010); 2) the amended complaint does not meet the pleading standards of Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 566 U.S. 662 (2009); 3) the amended complaint does not adequately plead an anticipatory defense of fraudulent concealment; and, 4) the prerequisites for an accounting claim have not been sufficiently pled.

On June 27, 2011, this Court filed a Report and Recommendation recommending that the motion be granted as to Plaintiffs' claims for recovery related to gas unaccounted for

---

[1]    Plaintiffs Pollock and Morris have dismissed their claims against ECA (Doc. # 35).

[2]    On April 24, 2012, the District Court entered an order dismissing with prejudice Plaintiffs' claim that ECA breached the leases by failing to pay the correct royalties on oil (Doc. # 64).

or lost before the point of sale.  It was also recommended that the remainder of ECA's motion be denied, including ECA's argument that Plaintiffs had failed to adequately plead a claim for legal accounting (Doc. # 22).  On August 22, 2011, the District Court entered an order granting in part and denying in part ECA's motion to dismiss (Doc. # 27).

On September 6, 2011, Plaintiffs filed a motion for a Court-Ordered Accounting averring that they were entitled to both a legal and equitable accounting from ECA (Doc. # 29).  On November 29, 2011, this Court filed a Memorandum and Opinion denying the motion as premature (Doc. # 38).

On June 15, 2012, ECA filed a motion for summary judgment and Plaintiffs filed a motion for partial summary judgment. Each filed a response and a reply and the motions are now ripe for disposition.

B.  <u>Standard of Review</u>

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate if, viewing the record in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."  <u>Hip Heightened Independence and Progress, Inc. v. Port Authority of New York and New</u>

Jersey, 693 F.3d 345, 351 (3d Cir. 2012).  A fact is "material"
if proof of its existence or non-existence might affect the
outcome of the litigation, and a dispute is "genuine" if "the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 248-49 (1986).

     In undertaking this analysis, courts view the facts in
the light most favorable to the non-moving party.  "After making
all reasonable inferences in the nonmoving party's favor, there
is a genuine issue of material fact if a reasonable jury could
find for the nonmoving party."  Pignataro v. Port Authority of
New York & New Jersey, 593 F.3d 265, 268 (3d Cir. 2010) (citing
Reliance Insurance Co. v. Moessner, 121 F.3d 895, 900 (3d Cir.
1997)).  While the moving party bears the initial burden of
showing the absence of a genuine issue of material fact, meeting
this obligation shifts the burden to the non-moving party who
must "set forth specific facts showing that there is a genuine
issue for trial."  Anderson, 477 U.S. at 250.  These rules apply
with equal force to cross-motions for summary judgment.
Lawrence v. City of Philadelphia, Pa., 527 F.3d 299, 310 (3d
Cir. 2008).  When reviewing each motion, the court is bound to
view the evidence in the light most favorable to the nonmovant.
Laughman ex rel. Campbell v. Black & Veatch Corporation, Civil

No. 1:09-CV-0695, 2010 WL 4514318, at *2 (M.D.Pa. November 2, 2010).

C. Discussion

1. ECA's Summary Judgment Motion

The following facts are viewed favorably to Plaintiffs:

Plaintiffs entered into oil and gas leases with ECA. Although the wording of the various leases is not identical, they all generally provide that the landowners are entitled to a royalty of $1/8^{th}$ of the net proceeds received from the sale of gas.[3]

---

[3] The gas royalty clause in the leases with John T. Dibiase, Stuart W. Whipkey, John S. Frayte and Patricia L. Christopher provides:

> Lessee agrees to pay … as a royalty for all gas produced and marketed, including all substances contained in such gas, one-eighth (1/8th) of the net proceeds received by Lessee from the sale of all gas produced, saved and sold from said premises.

The gas royalty clause in the lease with Louis A. Vecchio and Bessie P. Vecchio provides:

> Lessee covenants and agrees … [t]o pay Lessor as royalty for all gas and the constituents thereof, (except stored gas and gas produced from any storage horizon), including all liquid, solid or gaseous substances produced and saved from any said sand or sands and/or formations on the leased premises, an amount equal to

one-eighth (1/8th) of the price
received by the Lessee from the sale
of such gas and the constituents
thereof at the well head.

The gas royalty clause in the leases with Gene M.
Virgili, Erin R. Virgili and Lloyd R. Shaffer
provides:

Lessee covenants and agrees … [t]o
pay Lessor as royalty for all gas,
coalbed methane gas and the
constituents and related products
therefrom, including all liquid,
solid or gaseous substances produced
and saved from any sand or sands of
the leased premises, an amount equal
to one-eighth (1/8th) or 12.5% of the
net proceeds received by Lessee from
the sale of such gas, coalbed methane
gas, or the constituents and related
by products therefrom, at the
wellhead. In calculating the net
proceeds received by Lessee from the
sale of such … gas, coalbed methane
gas and the constituents and related
by products therefrom at the
wellhead, Lessee shall be entitled to
deduct from said price received (i)
Lessor's proportionate part of any
taxes levied on the severance or
production of oil, gas, coalbed
methane gas and the constituents and
related by products therefrom and
(ii) Lessor's proportionate part of
all post production cost incurred by
Lessee, (including internal post
production costs of Lessee, an
affiliate of Lessee and non-
affiliated third parties) together
with all transportation, gathering,
compression, processing, treating,
dehydration and marketing expenses
charged by Lessee, an affiliate of
Lessee or a non-affiliated third
party associated with the sale of
such oil, gas, coalbed methane gas,
and the constituents and related by
products therefrom, and any other
costs incurred by Lessee necessary to

It has previously been determined that "all the leases contemplate calculation of royalties by the net-back method" which permits ECA to compute royalties as "one-eighth of the sale price of the gas minus one-eighth of the post-production costs of getting the gas to market." Report and Recommendation at 14, 10 (Doc. #22).

The gas produced from the subject wells is measured at a field meter near each well to determine the field, or production, volume for that well. The gas is then transported, together with gas volumes produced from other wells, through a gathering system. Over ninety-nine percent of the gas is then delivered into either of two interstate pipeline systems, Texas Eastern ("TETCO") and Columbia Gas Transmission ("TCO"). This gas is then sold: (1) at one of five interconnect points with the interstate pipeline system; (2) out of a pool on the interstate system; or, (3) at other delivery points further downstream on the interstate system.

Prior to March 26, 2012, Eastern Marketing Corporation ("EMCO"), a marketing affiliate of ECA, and ECA were parties to

---

render the gas merchantable and to deliver the same to market.

Pls.' Amended Concise Statement of Material Facts, Ex. 1.

Gas Purchase/Sales Contract.[4]   The agreement identifies EMCO as

the buyer of the gas from the seller ECA and a "WHEREAS" clause

describes EMCO's role as an "Agent to purchase gas for

industrial endusers, local distribution companies, or other

marketers . . . ."  Pls.' Amended Concise Statement of Material

Facts, Ex. 18, Gas Purchase/Sales Contract.   The agreement

further provides that "[t]he title to the gas sold and delivered

pursuant to this Contract shall pass from SELLER to BUYER's

Purchaser(s) at the Delivery/Receipt point(s) identified  . . .

."  Id. at Article IV, Section 2.

        According to Randall Farkosh, EMCO's, and later, ECA's

trading and transportation manager, in most instances, EMCO pays

ECA a monthly weighted average sales price by pipeline "less any

of the deductions, marketing fee, transportation, gathering  . .

." for the gas.  Def.'s Concise Statement of Material Facts, Ex.

B, Farkosh Dep. at 51-53.[5]  The post-production costs charged

include fifty-two cents per dekatherm, for gathering,

compressing, and dehydrating the gas, marketing costs of fifteen

cents per decatherm, and interstate transportation costs.  Id.,

Ex 1, O'Malley Dep. at 49-50.  Under industry practice, the

third party purchasers of the gas provide the data regarding the

_____

[4]   As of March 26, 2012, EMCO was dissolved and
ECA now sells its gas directly to purchasers.

[5]   Between July 2009 and March 2010, the price of
gas produced from wells drilled before 2009 was
calculated differently.

gas volumes sold and the price paid for those volumes. _Id_.
O'Malley Dep. at 34. The title to the gas passes to the third
party purchasers at five delivery/receipt points into the
interstate pipeline system and the volume of gas sold is
measured at sales meters located at these points. Pls.' Amended
Concise Statement of Material Facts, Ex. 18, Gas Purchase/Sales
Contract.

In calculating royalties due for production on a well,
ECA allots to each well its pro rata share of the proceeds
received from the sale of aggregate gas volumes less the well's
allotted share of post-production costs. ECA first determines
the field volume of a given well as a percentage of the total
field volumes on the gathering system. It then allocates to
each well its pro rata share of the aggregated volumes sold
based upon the well's percentage share of the total field meter
production. ECA also allocates to each well its pro rata share
of the revenue received from the aggregate volumes sold to the
third – party purchasers less allocated post-production costs.
ECA then pays a royalty on that pro rata share. Def.s' Counter
Statement of Facts, Ex.2, O'Malley Decl. ¶ 6.

Based upon these facts, ECA advances five arguments in
support of its summary judgment motion: 1) there is no legal
basis for Plaintiffs' claim that the language of the leases
proscribes ECA's allocation methodology; 2) Plaintiffs' claim

that ECA improperly deducted certain post-production costs is expressly foreclosed by the <u>Kilmer</u> decision; 3) there is no factual support for Plaintiffs' claim that royalties are calculated based upon a "sham" price paid by an ECA affiliate; 4) Plaintiffs are not entitled to royalties on the upside of hedges benefiting a publicly traded trust that owns the rights to receive a portion of ECA's proceeds from the wells; and 5) Plaintiffs are not entitled to an accounting because they have not demonstrated that ECA has breached the leases.

     a.   <u>ECA's Allocation Method</u>

ECA defends its allocation method on two bases: 1) Pennsylvania law does not require that the right to allocate be specified in the lease; and, 2) its allocation method is reasonable and consistent with industry custom and practice.

First, as no Pennsylvania court has thoughtfully addressed the issue, ECA's argument that Pennsylvania law does not require that leases expressly authorize allocation is reasoned by implication. ECA first acknowledges that a minority of jurisdictions follow the "first marketable-product doctrine," <u>see</u> <u>e.g.</u>, <u>Estate of Tawney v. Columbia Natural Resources, LLC</u>, 219 W.Va. 266, 633 S.E.2d 22 (2006), under which the lessee is responsible for all post-production costs until the product arrives at market. ECA then references the Pennsylvania Supreme

Court's rejection of that doctrine in Kilmer v. Elexco Land Services, 605 Pa. 413, 990 A.2d 1147 (2010) and reasons that this rebuff validates its position that post-production costs that are incurred and reasonable may be allocated pro rata to individual wells as Kilmer requires courts to construe leases consistently with industry custom and practice.

Plaintiffs respond that Kilmer does not allow for allocation in the absence of an allocation clause in the lease. While agreeing that Kilmer permits calculation of royalties via the net-back method, Plaintiffs posit that Kilmer does not set a maximum royalty. Thus, in their situations, where the leases provide for a $1/8^{th}$ royalty, but do not contain an allocation provision, ECA can deduct only that portion of its costs that it can demonstrate were actually sustained by a particular well, i.e., those costs incurred before the specific well's gas is commingled with the gas from other wells. In support, Plaintiffs cite to a decision from the Court of Common Pleas of Allegheny County, Hall, et al. v. CNX Gas Company, No. GD 10-21633 (Allegheny County July 27, 2011).

In Hall,[6] plaintiffs and a gas company were parties to a lease which included the following relevant royalty provision:

---

[6]    The plaintiffs' claims in Hall were not based upon the Guaranteed Minimum Royalty Act construed in Kilmer.

## Royalty Provisions

**(3) Royalties** The royalties to be paid by lessee are:

\* \* \*

(b) <u>on gas</u> . . . produced from said land and sold or used beyond the well or for the extraction of gasoline or other product, an amount equal to one-eighth of the net amount realized by Lessee computed at the wellhead from the sale of such substances.

<u>Hall</u>, <u>id</u>. at 3.

In response to plaintiffs' allegations that they were denied royalty payments, the energy company filed preliminary objections, *inter alia*, to plaintiffs' claim that they did not receive royalties for gas that was lost after gas from their wells was commingled with gas from other wells. The court overruled the objection, concluding that the subject leases did not provide for the use of an allocation formula that did not measure the actual losses of plaintiffs' gas and determined that the leases only permitted losses before plaintiffs' gas was commingled with the gas from other wells. <u>Id</u>. at 3-4.

Plaintiffs urge that the <u>Hall</u> court's determination on the allocation issue is consistent with the maxim of Pennsylvania law that gas leases are to be construed narrowly against the lessee and supports their position that the right to allocate must be specified in the lease.

The Court is unconvinced that there exists any

authoritative Pennsylvania law on the right to allocate. <u>Kilmer</u> is silent on the issue and, <u>Hall's</u> analysis of the question is perfunctory and conclusory.[7]

Absent a declaration of Pennsylvania law, the next logical step is to look to the language of the leases. Again, silence thwarts a resolution as there is no mention of allocation in any of the leases. Plaintiffs simply agreed to a royalty calculated as $1/8^{th}$ of the net proceeds received from the sale of gas.

With neither a pronouncement of law nor a clear indication of the intent of the parties, the Court turns to ECA's position that its allocation method should be upheld because it is consistent with industry custom and practice. It is appropriate to consider prevailing business practices. <u>See</u> <u>Jacobs v. CNG Transmission Corporation</u>, 332 F.Supp. 2d. 759, 764 (W.D.Pa. 2004) (citing <u>Venture Oil Co. v. Fretts</u>, 152 Pa. 451, 25 A. 732 (1893)) (agreement for production of oil and gas must be construed both with reference to known practices within industry and evident intention of parties). <u>Cf</u>. <u>Kilmer</u>, 990 A.2d at 1157 (relying upon gas industry's definition of "royalty").

ECA submits the Declaration of Bruce Kramer, an

---

[7]        In addition, <u>Hall</u> is a decision from the Allegheny County Court of Common Pleas and, as such, is not binding authority.

attorney, law professor, and co-author of treatises and books on oil and gas law, including Williams & Meyers Oil and Gas Law, to support its proposition that industry custom permits its allocation methodology. According to Kramer:

> [T]hree factors, the nationalization of the natural gas marketplace, the fungible nature of natural gas, and the economic and technological infeasibility of tracing a molecule of natural gas produced from a single well through the various post-production activities . . . led to the development of an allocation methodology in order to treat natural gas from separate wells in a fair manner that became a custom and practice of the industry.

Def.'s Concise Statement of Material Facts, Ex. C, Kramer Decl. ¶12.

> Kramer further averred that:

> Historically oil and gas leases have been silent on the issue of using such an allocation methodology yet it has been the longstanding custom and practice of the industry for a lessee to combine natural gas production from various wells in a field and then use a reasonable allocation method to calculate royalty from the individual wells. . . . . [U]sing a weighted average pricing formula promotes fairness to all royalty owners because of the inability of the producer to trace a molecule of gas from the wellhead to the ultimate point of sale.

Id. at ¶ ¶ 15, 16.

Plaintiffs dispute Kramer's basic premise that gas leases have historically been silent on using an allocation

methodology and offer instead that leases routinely include such allocation provisions. In addition to identifying four leases recorded in a Pennsylvania county that include allocation clauses, Plaintiffs reference language from the Williams & Meyers treatise that they contend contradicts Kramer's proposition that leases with allocation clauses are not the industry norm. Section 643.6 of Williams & Meyers Oil and Gas Law, entitled "Variants of gas royalty clause: Other miscellaneous provisions" describes "some" lease forms that authorize the commingling of gas. Plaintiffs depict the treatise's citation to these lease provisions as evidence that gas leases "routinely include allocation provisions," Pls.' Resp. in Opp'n. at 2, and further assert that the reason for the "prevalent" inclusion of these allocation clauses is that, absent same, only actual costs incurred between the wellhead and point of sale can be deducted. Id. at 3.

Plaintiffs further claim that the Tawney decision supports their position that, minus an allocation clause, only costs actually incurred may be deducted. While acknowledging that Kilmer did not accept the Tawney court's view on deduction of post-production costs, Plaintiffs urge that Tawney's holding that, in instances where the lease allows for sharing of post-production costs, the lessee is entitled to credit for those costs only "to the extent they were actually incurred and they

15

were reasonable," id. at 28, reflects Pennsylvania law.

ECA responds that Plaintiffs have mischaracterized Kramer's/Williams & Meyers's discussion of allocation clauses. In an additional declaration, Kramer explains that the treatise's reference to "some" leases does not translate to Plaintiffs' assertion that allocation clauses are "widely prevalent." Kramer then reiterated his opinion, reasoned by thirty years' review of thousands of leases, "it is very rare for there to be express commingling language contained in the royalty clauses of those lease[s]." Def.'s Reply, Ex. A, Kramer Add'l Decl. ¶¶ 6,8.

ECA also faults Plaintiffs for their statement that the Tawney decision reflects the state of Pennsylvania law on the allocation issue. In addition to noting that Plaintiffs did not cite any authority for its legal conclusion, ECA offers that the evidence establishes the subject post-production costs were reasonable and actually incurred.

The Court concludes that there is no genuine issue of material fact concerning the propriety of ECA's allocation of costs. In opposition to Kramer's Declaration, an acknowledged scholar in oil and gas jurisprudence, Plaintiffs have produced four leases with allocation clauses and Kramer's reference to certain allocation provisions in the Williams & Meyers treatise. This information is insufficient to repudiate Kramer's expert

opinion that allocation of costs represents the industry standard and that ECA's allocation is in conformity with this established practice.

The Court also disagrees that <u>Tawney</u>, even if applicable, demands a conclusion that costs cannot be allocated. <u>Tawney's</u> holding that only costs that were actually incurred can be deducted does not require, as Plaintiffs urge, that the particular costs be directly traceable to a particular well.

Because the Court concludes that the undisputed evidence demonstrates that ECA's allocation of sold gas volumes less post-production costs is in conformity with the industry standard, it is recommended that its motion for summary judgment be granted on the issue of whether allocation is permissible.

b. <u>Post-Production Costs</u>

ECA next requests that summary judgment be granted in its favor on the question of whether it properly deducted certain post-production costs from Plaintiffs' royalty proceeds.

i. <u>Marketing Costs</u>

ECA claims that it has the right to deduct marketing costs from the gross proceeds of the gas sales even though the majority of the subject leases do not expressly authorize such deductions.[8]  Marketing costs have been described as expenses

---

[8]     The Virgil and Shaffer leases expressly authorize ECA to deduct marketing costs.

incurred in negotiating and managing contracts with third party purchasers, making nominations, and dealing with gas balancing issues. Def.'s Concise Statement of Material Facts, Ex. C, Kramer Decl. ¶18.

The parties join issue over whether the <u>Kilmer</u> decision allows for marketing costs deductions and which entity, ECA or its marketing subsidiary, EMCO, actually incurred the marketing costs.

In <u>Kilmer</u>, the Pennsylvania Supreme Court endorsed the gas industry's definition of "royalty" as "`[t]he landowner's share of production, free of expenses of production.'" <u>Id</u>. at 1157 (quoting Williams & Meyers <u>Oil and Gas Law Terms</u> § R). Production expenses include those costs incurred in drilling wells and bringing the product to the surface, but exclude the post-production costs of transporting the oil/gas from the wellhead to the point of sale. <u>Kilmer</u>, 990 A.2d at 1157. The Court, again quoting William & Meyers, listed the following as **examples** of costs incurred after production: "production or gathering taxes, costs of treatment of the product to render it marketable, costs of transportation to market." <u>Id</u>.

ECA construes <u>Kilmer</u> to permit energy companies to deduct marketing costs even though some of the leases do not explicitly identify what particular post-production costs can be deducted. The Plaintiffs counter that when the lease is silent

on the categories of deductible post-production costs, only those expenses described in <u>Kilmer</u> i.e., "transportation, processing or manufacturing" can be subtracted from the amount of royalties due the landowners.

The Court concludes that neither <u>Kilmer</u> nor the legal treatise on which it relies recite an exhaustive list of the categories of post-production costs that are deductible under the net-back method. Both authorities define royalty generally as the landowner's share of the amount received for the commodity, free of expenses of production. Then, mimicking William & Meyers, the <u>Kilmer</u> Court identifies examples of post-production costs without any indication that the list was to be interpreted as comprehensive. The Court thereby concludes that, in general, the assessment of marketing costs was not contrary to law.

Plaintiffs next argue that even if marketing costs are generally deductible, they are not in this case because these costs were incurred by EMCO, ECA's marketing company, and not by ECA itself. ECA disputes Plaintiffs' characterization of the relationship between ECA and ECMO and offers instead that the undisputed evidence establishes that ECA actually incurred and paid the marketing costs.

Although the Court announced its intention to

independently evaluate the parties' respective motions for summary judgment, on this question, that approach is not economical. In presenting their arguments in the context of ECA's motion, both parties refer to pleadings filed in conjunction with Plaintiffs' motion; the Court will likewise examine the pleadings from both motions to decide this issue.

The undisputed facts concerning the marketing arrangement between ECA and EMCO are as follows:

Prior to March 26, 2012, EMCO and ECA were parties to Gas Purchase/Sales Contract. Under this agreement, EMCO buys the gas from ECA, and acts as an agent to purchase gas for third party purchasers.[9] EMCO then markets the gas and deducts the $.15 marketing cost from the weighted average sales price of the gas paid by EMCO to ECA. Title to the gas sold and delivered pursuant to the contract passes from ECA to the third party purchasers at five delivery/receipt points into the interstate pipeline system.

Whether the marketing fee is chargeable to the Plaintiffs depends upon which entity actually incurs the marketing costs and requires an analysis of the legal

---

[9] While the parties label EMCO as the "buyer" of the gas, this designation is somewhat problematic because the title of the gas passes from ECA to the third party purchasers. Since EMCO never holds title to the gas, the Court is not convinced that a traditional "sale" occurs.

relationship between ECA and ECMO.  The Plaintiffs contend that ECA does not incur marketing costs because, under the express terms of the Gas Purchase/Sales Contract, ECA sells the gas to EMCO which then acts as the agent for the buyers of the gas. Plaintiffs maintain that because the marketing costs are incurred after ECA sells the gas, those costs are chargeable to ECMO's third party purchaser clients and not to them. Plaintiffs further argue that it is immaterial that EMCO purportedly charges the marketing fee to ECA – that arrangement instead functions to allow ECA, EMCO, and ECMO's principals to pass off the marketing costs to the Plaintiffs.

ECA responds that, since it is undisputed that it incurs the marketing fees, these costs are included in the category of post-production costs encompassed by the definition of royalty and can be subtracted from the proceeds payable to the Plaintiffs from the sale of the gas.

ECA additionally suggests that summary judgment is inappropriate because a question of fact exists regarding the nature of the relationship between ECA and ECMO.  Referring to the testimony of Ronald Farkosh that EMCO acted on behalf of ECA in respect to marketing the gas, <u>see</u> Pls'. Am. App'x to Concise Statement of Material Facts, Ex. 16, Farkosh Dep. at 23, ECA contends that this testimony, accepted as true, demonstrates that the parties' post-contractual course of conduct is at

variance with the contractual language. ECA then argues that because Pennsylvania law allows that a contract may be modified by a subsequent oral agreement, Farkosh's testimony raises an issue of fact precluding summary judgment in Plaintiffs' favor on this issue.

To this response, Plaintiffs accurately reply that reliance on Pennsylvania law is misplaced as the subject contract is interpreted under West Virginia law. Id. at Ex 21, Gas/Purchase Sales Contract Art. XIII, ¶ 1. However, it does not appear that West Virginia law is at variance with Pennsylvania in this regard. See Pasquale v. Ohio Power Company, 186 W.Va. 501, 504, 413 S.E.2d 156, 159 (1991) (written contract may be altered or supplemented by valid parol contract subsequently made). Additionally, the contractual provision which provides that the subject Gas/Sales Contract represents "the entire agreement between the parties, and except as stated herein, there are no oral promises, agreements, or warranties, promises, obligations, assurances, or conditions precedent or otherwise, affecting it," Id. at ¶ 4, does not, as Plaintiffs suggest, preclude the possibility of a subsequent modification.

Under Rule 56, summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. This standard has not been met in this case. First, the

nature of the transactions governed by the contract is itself ambiguous. While the Gas Purchase/Sales Contract describes EMCO as the buyer of the gas, it also provides that EMCO never holds title to the gas. Second, there is a dispute regarding whether the post-formation behavior of the parties constituted an oral modification of the contract. The Court cannot conclude that either party is clearly entitled to a judgment as a matter of law and recommends that both ECA's and Plaintiffs' Motions for Summary Judgment be denied on the marketing costs issue.

### ii. Compression/Dehydration Costs

Amidst its argument that its deduction of certain post-production costs is proper, ECA makes reference to the fact that it deducts the costs associated with compressing and dehydrating the gas produced from Plaintiffs' wells from the royalties paid. Plaintiffs argue that these deductions are inappropriate for three reasons: some of the gas does not require compression or dehydration, ECA cannot deduct the cost of electricity used for compressors because some the compressors are fueled by gas, and, ECA's allocation methodology deducts gas used to operate the compressors off the leased premises even though the leases only permit royalty-free use of gas on the premises. ECA replies that no evidence supports Plaintiffs' claims that the gas from their wells does not require compression and dehydration or that ECA allocated electricity

cost for compressors that are powered by natural gas. Finally, in a footnote, ECA disputes Plaintiffs' characterization of its allocation methodology as allowing for deduction of gas used for fuel, claiming instead that it simply pays royalties on the volume of gas that is sold.

As with the issue of the deduction of marketing costs, the facts/legal arguments concerning the compression and dehydration of the subject gas are better defined in the pleadings filed in conjunction with the Plaintiffs' summary judgment motion and will be discussed *infra*.

c. Price Paid for Gas by EMCO

ECA next argues that there is no factual basis for Plaintiffs' allegation that ECA breached the leases "by calculating the royalties using a price that was less that the price paid to ECA," see Compl. at ¶ 39, i.e., the price paid by EMCO. ECA asserts instead that the evidence demonstrates that it calculates Plaintiffs' royalties on the net proceeds received from the sale of gas to the third party purchasers. As Plaintiffs do not dispute this aspect of the royalty calculation, to the extent relevant, it is recommended that summary judgment be granted to ECA on this point.

d. Hedge Contracts

ECA also urges that Plaintiffs are not entitled to royalties on the upside of hedges benefiting the ECA Marcellus

Trust (the "Trust"), a publicly traded trust that owns the rights to receive a portion of ECA's proceeds from sale of gas from Plaintiffs' wells. In addition to noting that this particular claim of underpayment was not alleged in Plaintiffs' complaint, ECA's relationship with the Trust is unconnected to its lease obligations with the Plaintiffs and irrelevant to the matters before the Court. It is therefore recommended that summary judgment be granted to ECA on Plaintiffs' right to royalties on the proceeds from the hedging instruments.

### e. Accounting Claim

ECA's final argument is that Plaintiffs have not established that they are entitled to an accounting because they have not produced any evidence that ECA breached or failed in any duty under the leases. Because some issues as to liability remain outstanding after the recommended disposition of the summary judgment motions, adjudication of the accounting claim is premature.

### 2. Plaintiffs' Partial Summary Judgment Motion

Plaintiffs contend that they are entitled to partial summary judgment because ECA breached the leases by: 1) subtracting an allocated, not actual, amount of lost and used gas produced at the wellhead; 2) deducting an allocated, not actual amount of post-production costs; 3) deducting marketing costs that were actually incurred by EMCO; and 4) deducting

charges for interstate transportation that were incurred after ECA sold and transferred title to the gas. Plaintiffs also seek a judgment that, under the discovery rule, their claims are timely back to the first royalty payment under each lease and are not limited to the period beginning four years before the filing of the complaint.

a. <u>Allocation of Lost/Used Gas</u>

Understandably, there is overlap between Plaintiffs' partial summary judgment motion and their response to ECA's summary judgment motion. Accordingly, because the Court has already addressed and rejected Plaintiffs' general argument concerning ECA's right to allocate, it turns to their more specific claim that ECA's allocation of lost and used gas breaches the leases.

In its opening brief, Plaintiffs first protest that ECA's allocation methodology is flawed because ECA deducts compressor and dehydrator fuel from wells whose gas is neither compressed nor dehydrated, some of the gas from the wells on the ECA system do not require compression or dehydration, and ECA deducts gas used off the premises in violation of the leases which limit the free use to operations occurring on the premises.

As to the necessity of the compression/dehydration expenses, Plaintiffs urge that the deposition testimony of

George Steven Sly, the president of the company that provides ECA with gas measurement and allocation services, reveals that only some of the gas from ECA's wells requires compression and dehydration. Regarding whether the gas from the subject wells actually receives these treatments, Plaintiffs presented the affidavit of John DiBiase, one of the plaintiffs in this lawsuit, averring that the gas from his well is neither compressed nor dehydrated before it is delivered into the pipeline system.

ECA responds that Sly's testimony that only a minority of ECA's Pennsylvania wells require these operations is a generalized statement, not specifically tied to the subject wells. It also questions the probative value of DiBiase's affidavit, which is reasoned solely on his observation that he has never seen compressing/dehydrating equipment between his well and the pipeline, and is limited to his property only. In opposition to DiBiase's affidavit, ECA points to the Declaration of George O'Malley, ECA's Vice President of Accounting, averring that all the gas from the subject wells, including that originating from Mr. DiBiase's property, "is compressed and dehydrated prior to delivery to an interstate pipeline system." Def.'s Responsive Concise Statement of Material Facts, Ex. A, O'Malley Dec. ¶ 8.

As to whether the subject gas is actually compressed

and/or dehydrated, save Mr. DiBiase's affidavit, the undisputed evidence is that the gas from the subject wells undergoes these processes. Therefore, it is recommended that summary judgment be granted to ECA on this issue, except as to Plaintiff DiBiase, whose affidavit creates an issue of fact.

Plaintiffs also argue that ECA's allocation method results in the deduction of gas used by ECA off the leased premises. While, the Court has also previously decided that _Kilmer_ forecloses Plaintiffs' recovery for gas that is unaccounted for or lost between extraction and the point of sale, Report & Recommendation at 13-14, despite both parties' representations to the contrary, it has not specifically addressed the issue of whether ECA's use of gas off the leased premises constitutes a breach of the leases. The Court's precise language recommended that ECA's motion to dismiss be granted on "Plaintiffs' breach of contract claim for recovery of royalties on volumes of gas **lost or unaccounted for** before the point of sale is foreclosed by _Kilmer_." Report & Recommendation at 14 (emphasis added). _See also_ Order Granting in part and Denying in part ECA's Motion to Dismiss at (Doc. # 27) (whether ECA has free use of gas only on premises does not implicate lease provision that royalties are calculated by the netback method; they are two distinct provisions and concepts and are independently interpreted). Gas used to fuel compressors and

dehydrators is neither lost nor unaccounted. It remains to be decided if ECA's allocation methodology regarding gas usage off the premised breaches the leases.

The Court agrees with Plaintiffs that the leases do not provide that ECA has free use of gas from the wells off the premises. ECA does not respond to this argument, citing its interpretation of the Court's prior recommendation on lost and unaccounted for gas. Given the misunderstanding that has arisen on this issue, the Court cannot fairly adjudicate it at this juncture and recommends that summary judgment be denied.

b & c. <u>Allocation of Post-Production Costs and Marketing Costs</u>

On the issues of allocation of post-production costs and deduction of marketing costs, the Court recommends that summary judgment be denied for the reasons stated in its discussion of ECA's motion for summary judgment.

d. <u>Interstate Transportation Charges</u>

Plaintiffs also argue that ECA breached the leases by deducting charges for interstate transportation that were incurred after ECA transferred title of the gas to third party purchasers at the five points where the gas is received into the interstate pipeline system.

In addition to objecting that Plaintiffs did not assert this claim in their complaint, ECA answers that the claim

is superficial because, regardless of the passage of title, ECA actually incurred and paid the cost of transporting the gas on the interstate pipeline. See O'Malley Dec. at ¶ 3 ("charges for [interstate pipeline] transportation are paid by ECA").

The Court first concludes that it can consider this claim because it is reasonably understood as included in the amended complaint's allegation that ECA breached the leases by "taking excessive and unauthorized expense deductions when calculating the gas royalty." Am. Compl. ¶ 32.

As to the merits, Kilmer defines post-production costs as those "expenditures from when the gas exits the ground until it is sold." 990 A.2d 1149, n 2. Thus, the proper inquiry is the point at which the gas is sold, and not, as ECA suggests, whether ECA actually incurred the interstate pipeline transportation costs. On this point, it is undisputed EMCO buys the gas from ECA. It is also undisputed that, under the terms of the Gas Purchase/Sales Contract, ECA retains title to the gas until it passes to third party purchasers at the five points where the gas is received into the interstate system. Thus, the gas is "sold" at these points and ECA cannot recover costs incurred thereafter. Therefore, it is recommended that summary judgment be granted in Plaintiffs' favor on this claim.

e. Discovery Rule

Finally, Plaintiffs urge the Court to employ the

discovery rule and decide that they are entitled to seek damages for underpayment of royalties for more than four years prior to the filing of the lawsuit. The Court recommends that summary judgment be denied on this issue because the question, more appropriately addressed in the damages phase, "involves a factual determination as to whether the party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily a jury is to decide it." Fine v. Checcio, 582 Pa. 253, 268, 870 A.2d 850, 858 (2005).

D. Conclusion

For the reasons set out in this Report and Recommendation, it is respectfully recommended that ECA's motion for summary judgment (Doc. # 66) be granted in part and denied in part. It is recommended that the motion be granted on the questions of: 1) the propriety of ECA's allocation methodology; 2) except as to the DiBiase property, the compression/dehydration of the gas from the Plaintiffs' wells; 3) the calculation of royalties based upon the net proceeds received from the third-party purchasers; and, 4) plaintiff's non-entitlement to royalties on the proceeds from certain hedging instruments. It is recommended that the motion be denied on whether ECA properly allocated its marketing costs.

It is further recommended that Plaintiffs' motion for summary judgment (Doc. # 69) be granted in part and denied in

part.  It is recommended that the motion be granted on the issue of interstate pipeline charges and denied in all other respects.

Within the time limits set forth in the attached notice of electronic filing, any party may serve and file written objections to the Report and Recommendation.  Any party opposing the objections shall have fourteen (14) days from the date of service of the objections to respond thereto.  Failure to file timely objections may constitute waiver of any appellate rights.


Dated: October 24, 2012          Respectfully submitted,

                                 s/Robert C. Mitchell
                                 Robert C. Mitchell
                                 United States Magistrate Judge