IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID F. POLLOCK, et al.,       )
                Plaintiffs,     )
                           )
    vs.                    )      Civil Action No. 10-1553
                           )
ENERGY CORPORATION OF    )
AMERICA,                  )
                Defendant.    )

## SUPPLEMENTAL REPORT AND RECOMMENDATION

**REPORT**

**I.      INTRODUCTION**

Pending before the Court is Plaintiffs' Motion for Class Certification. [ECF No. 106]. For the reasons that follow, it is respectfully recommended that Plaintiffs' Motion for Class Certification be granted in part and denied in part.[1]

**II.      BACKGROUND**

The named Plaintiffs are Pennsylvania landowners who entered into oil and gas leases with Defendant, Energy Corporation of America, ("ECA"), a company engaged in the production of oil and gas. Generally, Plaintiffs allege that ECA underpaid natural gas royalties owed to them under their oil and gas leases. Plaintiffs provide the following backdrop in support

---

[1] The Court entered a Report and Recommendation [ECF No. 134] on August 5, 2013 recommending that Plaintiffs' Motion for Class Certification be denied. Plaintiffs filed timely objections to the Report and Recommendation to which Defendant responded. Upon review of the objections and responses, it is apparent that Plaintiffs' Motion for Class Certification should be granted as to subclass one and subclass two, but denied in respect to subclass three. Because the objections and responses to the Report and Recommendation streamline the parties' respective arguments and the evidence presented in support of their respective arguments, the Court will treat the objections and responses as additional briefing and will consider them in this Supplemental Report and Recommendation. Accordingly, the Court will only address those issues raised in the original briefing. Consequently, the Report and Recommendation [ECF No. 134] entered on August 5, 2013 is vacated, and this Supplemental Report and Recommendation constitutes the operative findings of the Magistrate Judge.

of their claims:

In the natural gas industry, gas is produced at the wellhead and transported through a system of small gauge "gathering" lines to the interstate pipeline system, a network on interconnecting pipeline systems owned by various interstate pipeline companies engaged in the business of transporting gas on behalf of the owner of the gas. The owner of the gas, designated as the "shipper" on contracts with the interstate pipeline companies, delivers the gas into the interstate pipeline system at any one of thousands of "receipt points" and out of the interstate pipeline system at any one of thousands of "delivery points."

Gas producers can either sell the gas at the receipt point into the interstate pipeline or can enter into transportation agreements with one or more interstate pipeline companies to transport the gas through the interstate pipeline companies for sale to a more distant buyer. When gas is sold at the receipt price into the interstate pipeline system, it is sold at the published "pool" price for that receipt point. The pool is a virtual pool, not an actual pool, and is simply an accounting mechanism used in the industry for setting the price of sales at the entrance to the interstate pipeline system. The entity buying the gas from the producer at the pool price then enters into transportation agreements with the interstate pipeline company (or companies) to transport the gas through the interstate pipeline to the next buyer of the gas.

Producers often do not sell their gas at the receipt point into the interstate pipeline system. Instead, they frequently transport the gas through the interstate pipeline system on its own behalf to a more distant buyer. When this occurs, the producer enters into its own transportation agreements with the interstate pipeline companies. Dispositive as to who owns the gas transported through the interstate pipeline system is the entity designated as the "shipper" on the transportation agreements. [Under] federal law the owner and the shipper must be the same. *See* 18 C.F.R. 284.8[.] The transportation agreements, filed with and approved by the Federal Energy Regulatory Commission ("FERC"), must include a warranty by the shipper that the shipper holds title to the gas. A shipper that submits a false warranty as to the ownership of the gas is subject to strict FERC enforcement[.] . . .

The sale price at the delivery points on the interstate pipeline system is invariably higher than the pool price paid at the entrance to the interstate system, even when the cost of the interstate transportation is subtracted.

Pls.' Resp. to Interrogatories [ECF No. 121-11] at 3-4. Plaintiffs allege that prior to March 26, 2012, Eastern Marketing Corporation ("EMCO"), a marketing affiliate a subsidiary of ECA and ECA entered into a Gas Purchase/Sales Contract.[2] The agreement identifies EMCO as the buyer of the gas and ECA as the seller, and contains a "WHEREAS" clause that describes EMCO's role as an "Agent to purchase gas for industrial end users, local distribution companies, or other markets." Pls.' Amended Concise Statement of Material Facts [ECF No. 83]; Gas Purchase/Sales Contract [ECF No. 83-21]. The agreement further provides that "[t]he title to the gas sold and delivered pursuant to this Contract shall pass from SELLER [ECA] to BUYER's [EMCO's] Purchaser(s) at the Deliver/Receipt point(s) identified." *Id*.

EMCO paid ECA a monthly weighted average sales price per pipeline less any of the deductions, marketing fees, transportation, and gathering fees for the gas. Def.'s Concise Statement of Material Facts [ECF No. 68] at ¶ 11; Farkosh Dep. [ECF No. 68-2] at 51-53. Under industry practice, the third party purchaser of the gas provides the data regarding the gas volumes sold and the price paid for those volumes. Def.'s Concise Statement of Material Facts [ECF No. 68] at ¶ 17; O'Malley Dep. [ECF No. 68-1] at 34. The title to gas passes to the third party purchasers at five delivery/receipt points into the interstate pipeline system and the volume of gas sold is measured at sales meters located at these points. Pl.'s Am. Concise Statement of Material Facts [ECF No. 82] at ¶ 58; Gas Purchase/Sales Contract [ECF No. 83-21].

Generally, Plaintiffs allege that ECA deducted amounts from the royalty payments that were not permitted under their leases. Consistent with the Guaranteed Minimum Royalty Act, the leases provide that the landowners are entitled to a one-eighth royalty of the net proceeds received from the sale of gas. The putative class representatives executed differing lease

---

[2] As of March 26, 2012, EMCO was dissolved and ECA now sells its gas directly to purchasers, thus March 26, 2012 is the operative date to determine the remaining claims.

agreements at different time periods spanning from 2002 to 2009. The Dibiase lease executed on

September 5, 2002, the Whipkey lease executed on March 3, 2005, the Frayte lease executed on

June 10, 2005, and the Christopher lease executed on August 26, 2005 provide in pertinent part:

> Lessee agrees to pay . . . as a royalty for all gas produced and
> marketed, including all substances contained in such gas, one-
> eighth (1/8th) of the net proceeds received by Lessee from the sale
> of all gas produced, saved and sold from said premises.

*See* Dibiase Oil and Gas Lease [ECF No. 106-2] at 3; Frayte Oil and Gas Lease [ECF No. 106-2]

at 7; Christopher Oil and Gas Lease [ECF No. 106-2] at 11; Whipkey Oil and Gas Lease [ECF

No. 12-1] at 14.

The Vecchio lease executed on March 13, 2006 contains a gas royalty provision that

provides in pertinent part:

> Lessee covenants and agrees . . . [t]o pay Lessor as royalty for all
> gas and the constituents thereof, (except stored gas and gas
> produced from any storage horizon), including all liquid, solid or
> gaseous substances produced and saved from any said sand or
> sands and/or formations on the lease premises, an amount equal to
> one-eighth (1/8th) of the price received by the Lessee from the sale
> of such gas and the constituents at the well head.

*See* Vecchio Oil and Gas Lease [ECF No. 106-2] at 15.

The Virgili lease executed on April 20, 2007 and the Shaffer lease executed on March 12,

2009 provide in pertinent part:

> In calculating the net proceeds received by Lessee from the sale of
> such . . . gas . . . at the wellhead, Lessee shall be entitled to deduct
> from the price received . . . Lessor's proportionate part of all post
> production cost incurred by Lessee (including internal post
> production costs of Lessee, an affiliate of Lessee and non-affiliated
> third parties) together with all transportation, gathering,
> compression, processing, treating, dehydration and marketing
> expenses charged by Lessee, an affiliate of Lessee or an non-
> affiliated third party associated with the sale of such . . . gas . . .
> and any other costs incurred by Lessee necessary to render the gas
> merchantable and to deliver the same to market.

Virgili Oil and Gas Lease [ECF No. 106-2] at 19; Shaffer Oil and Gas Lease [ECF No. 106-2] at 22.

The leases also provide differing language with respect to the free use provision. The Christopher, Dibiase, Frayte and Whipkey leases provide:

> Lessee shall have the right to use, free of royalty or any other charge, gas, oil and water from the premises **for drilling operations <u>on</u> the premises**.

*See* Christopher Oil and Gas Lease [ECF No. 106-2] at 11; Dibiase Oil and Gas Lease [ECF No. 106-2] at 3; Frayte Oil and Gas Lease [ECF No. 106-2] at 7; Whipkey Oil and Gas Lease [ECF No. 12-1] at 14. (emphasis added).

The free use clause in the Shaffer, Vecchio and Virgili leases provide:

> Lessee shall have the right to use, free of royalty or any other charge, gas, oil and water from the leased premises **for drilling and production operation <u>of</u> the leased premises**. Said rights shall include, but are not limited to injection, compression, dehydration, distillation, pumping and heat.

*See* Shaffer Oil and Gas Lease [ECF No. 106-2] at 22; Vecchio Oil and Gas Lease [ECF No. 106-2] at 15; Virgili Oil and Gas Lease [ECF No. 106-2] at 19 (emphasis added). Plaintiffs allege that these two provisions are functionally equivalent and mandate that the gas extracted can be used free from royalty payments only if it is consumed on the leased premises. *See* Pls.' Br. in Supp. of Mot. for Class Cert. [ECF No. 107] at 7.

Three claims remain against ECA. Plaintiffs allege that ECA breached their oil and gas leases by (1) deducting charges from Plaintiffs' royalty payments for interstate transportation charges incurred after the gas was sold; (2) deducting marketing fees from Plaintiffs' royalty payments that ECA did not incur because it sold the gas to a single buyer under a long-term contract; (3) and failing to pay a royalty on gas used as plant fuel off of the leased premises. Pls.'

Mot. for Class Cert. [ECF No. 106] at ¶ 2.  Plaintiffs seek to certify the following class under

Federal Rule of Civil Procedure 23:

> All lessors on an oil and gas lease with Energy Corporation of
> America or Eastern American Energy Corporation that conveys oil
> and gas rights to real property in Pennsylvania and (1) the lessee
> deducted charges for interstate pipeline services prior to March 26,
> 2012 (sub-class 1); and/or (2) the lessee deducted marketing fees
> from the royalties prior to March 26, 2012 (subclass 2); and/or (3)
> the lessee failed to pay a royalty on gas used as plant fuel off the
> leased premises (subclass 3).

*Id.* at 4.  A class certification hearing was held on June 11, 2013. *See* Minute Entry of 6/11/2013

[ECF No. 124].

## III.     <u>STANDARD OF REVIEW</u>

Parties seeking to represent the class "must affirmatively demonstrate [their] compliance"

with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 562 U.S. --, -- 131 S.Ct. 2541, 2551 (June 20,

2011). *See also Comcast v. Behrend*, -- U.S. --, -- 133 S.Ct. 1426, 1432 (March 27, 2013).

Federal Rule of Civil Procedure 23 "does not set forth a mere pleading standard." *Comcast*, 133

S.Ct. at 1432 (quoting *Wal-Mart*, 131 S.Ct. at 2551). The putative representatives must "'be

prepared to prove that there are in fact sufficiently numerous parties, common questions of law

or fact,' typicality of claims or defenses, and adequacy of representation[.]" *Ibid*.  However,

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification

stage.  Merits questions may be considered to the extent – but only to the extent – that they are

relevant to determining whether Rule 23 prerequisites for class certification are satisfied."

*Agmen Inc. v. Connecticut Retirement Plans and Trust Funds*, -- U.S. --, -- 133 S.Ct. 1184, 1194-

95 (Feb. 27, 2013).

In making its decision, "the district court must make whatever factual and legal inquiries

are necessary and must consider all relevant evidence and arguments presented by the parties."

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008). The putative representatives must make more than a "threshold showing" that requirements of Rule 23 are satisfied. *Id.*

Where the merits of the claim and a requirement for class certification coincide, the court may resolve factual disputes to determine whether the proposed class should be certified. *Id.* at 316. "Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence" by the party seeking class certification. *Id.* at 307. In making factual determinations, "[i]t may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and . . . certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast*, 133 S.Ct. at 1432. "A party's assurance to the court that it intends or plans to meet the requirements is insufficient." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 318 (citations omitted). "[W]here the court finds, on the basis of substantial evidence . . . that there are serious problems now appearing, it should not certify the class merely on the assurance of counsel that some solution will be found." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191 (3d Cir. 2001) (quoting *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 70 (4th Cir. 1977)). "Although the district court's findings for the purpose of class certification are conclusive on that topic, they do not bind the fact-finder on the merits." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 318. The district court must make a "rigorous analysis" that the prerequisites of Rule 23 are satisfied, and "[f]requently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Hayes v. Wal-Mart Stores, Inc.*, -- F.3d --, --, 2013 WL 3957757, at *2 (3d Cir. Aug. 2, 2013).

## IV.    **ANALYSIS**

Primarily, Plaintiffs seek certification of three separate subclasses.  Under Federal Rule of Civil Procedure 23(c)(4), "a class may be divided into sub-classes that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(4).  Therefore, the Court will analyze each subclass separately to determine whether the subclass is proper for class certification.

### a.  Ascertainability

As a prerequisite to a Rule 23 analysis, "the Court first must consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class." *Gates v. Rohm and Haas, Co.*, 265 F.R.D. 208, 214 (E.D.Pa. 2010) (citing *East Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).  This is generally referred to as the "ascertainability" factor. *See Hayes,* 2013 WL 3957757, at *3 (3d Cir. 2013); *Marcus v. BMW of North America*, 687 F.3d 583, 596 (3d Cir. 2012).  In making this determination, the court considers whether "a particular group . . . was harmed during a particular time frame, in a particular location, in a particular way, and uses objective criteria." *Hayes*, 2013 WL 3957757, at *3.  Plaintiffs "need not prove that class members have been injured for purposes of defining the class." *Id*.  "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials', then a class action is inappropriate." *Marcus*, 687 F.3d at 592.  By determining whether the class is sufficiently ascertainable before delving into a Rule 23 analysis, "it eliminates 'serious administrative burdens that are incongruous with the efficiencies expected in a class action' by insisting on the easy identification of class members." *Id*. at 593 (quoting *Sanneman v. Chrysler Corp*., 191 F.R.D. 441, 446 (E.D.Pa. 2000)).  It also "protect[s] absent class members by facilitating the 'best notice practicable' under Rule 23(c)(2) in a Rule 23(b)(3) action." *Marcus*, 687 F.3d at 593.  "[Additionally,] it protects defendants by ensuring that those

persons who will be bound by the final judgment are clearly identifiable." *Id*. In summary, a "plaintiff must show by a preponderance of the evidence that there is a reliable and administratively feasible method for ascertaining the class." *Hayes*, 2013 WL 3957757, at \*5.

Although neither party has addressed the ascertainability factor, the proposed sub-classes, as defined, are sufficiently ascertainable. The classes are limited to those who hold leases with ECA in the state of Pennsylvania for the applicable time period. This can be proven objectively through company records. Therefore, the class is clearly identifiable and administratively feasible. The ascertainability factor is met.

### b. Subclass One: Improperly Deducted Interstate Transportation Charges Incurred After the Gas was Sold

Subclass one consists of all Pennsylvania lessors holding an oil and gas lease with ECA (or EMCO) that ECA deducted charges for interstate pipeline services prior to March 26, 2012. Pls.' Br. in Supp. of Mot. for Class Cert. [ECF No. 107] at 4. In support of their claim for improperly deducted interstate transportation charges, Plaintiffs claim that:

> Under Pennsylvania law, the only post production costs that can be deducted from natural gas royalties are costs incurred <u>before</u> the lessee sells the gas. Prior to March 26, 2012, ECA sold all of its Pennsylvania gas production to a single buyer, Eastern Marketing Company ("EMCO"), at delivery points <u>into</u> the interstate pipeline system. Notwithstanding, ECA deducted charges for interstate pipeline services from the royalties. This Court has entered summary judgment that ECA breached the leases by deducting charges for interstate transportation incurred after it sold the gas.

*Id*. at 6 (emphasis in original) (citations omitted).

ECA argues that while the Court has determined that the net-back method does not permit ECA to deduct interstate transportation charges to the extent that ECA itself did not incur those costs prior to sale, "ECA will establish at trial that the deduction of the interstate transportation and marketing costs was proper because it did incur those post-production costs

prior to the sale of the gas." Def.'s Resp. to Obj. [ECF No. 136] at 4-5. Further, ECA argues that leases entered into after 2007 expressly allow ECA to deduct these costs whether incurred by ECA, its affiliate, or a third party and as such these lessors cannot state a claim because the lease expressly allows this type of deduction. *Id*. at 5. Further, ECA claims that it "does not utilize interstate transportation . . . for the gas it produces from all wells in Pennsylvania. *Id*. The vast majority of interstate transportation charges at issue here are limited to gas flowing on the A.C. Nielsen gathering line in Greene County, Pennsylvania. *Id*. That gas flows under a firm transportation contract that ECA entered into with Columbia Gas Transmission ("TCO") on July 29, 2011." *Id*. at 6-7.

For the following reasons, the Court finds that subclass one meets the Rule 23 factors and respectfully recommends that this subclass be certified.

      i.  <u>Numerosity</u>

To satisfy numerosity, no "magic number" exists. *Stewert v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001). Generally, classes of forty (40) plaintiffs or more suffice. *Id*. Additionally, to establish numerosity, the named class must be "sufficiently identifiable without being overly broad" to determine whether a putative class member has been subject to the alleged harm. *Mueller v. CBS, Inc.*, 200 F.R.D. 227, 233 (W.D.Pa. 2001). A proposed class is not numerous if it is "amorphous, vague, or indeterminate." *Id*. at 233 (citations and internal quotations omitted). Plaintiffs need not present "direct evidence of the exact number and identities of class members. But in the absence of direct evidence, a plaintiff must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a court to make a factual finding." *Marcus*, 687 F.3d at 596. If direct evidence is absent, the court may "forgo precise calculations and exact

numbers" and rely on its "common sense" that numerosity is met. *Id*. at 597 (citing *Lloyd v. City of Phila*., 121 F.R.D. 246, 249 (E.D.Pa. 1988) (numerosity not satisfied where a preponderance of the evidence suggested only four plaintiffs met the defined class where plaintiff speculated class exceeded 10,000). Additionally, "where a putative class is some subset of a larger pool, the trial court may not infer numerosity from the number in the larger pool alone." *Hayes*, 2013 WL 3957757, at *6.

Plaintiffs point to the following evidence in support of numerosity: A Pennsylvania Department of Environmental Protection ("DEP") report illustrates that ECA is a lessee to 1,623 active gas wells in Pennsylvania. Pls.' Obj. [ECF No. 135] at 6. Plaintiffs argue that because the leases of the nine named Plaintiffs illustrate that there are typically two lessors on an oil and gas lease, it is likely that ECA has more than 3,000 lessors in Pennsylvania. *Id*. Moreover, ECA's Vice President of Marketing testified that ECA deducts charges for interstate transportation from royalties of Pennsylvania lessors. Additionally, ECA's Vice President of Accounting, George O'Malley's declaration illustrates that prior to March 26, 2012, the transportation charges were all incurred after ECA sold the gas, and under *Kilmer v. Elexco Land Servs., Inc.,* 990 A.2d 1147 (Pa. 2010) ("*Kilmer*"), interstate transportation charges were not deductible from Plaintiffs' royalty payments. *Id*. Also, Plaintiffs point to the interstate transportation agreement between ECA and Columbia Gas Transmission, LLC, an interstate pipeline company that ECA uses to transport the gas of the other nine named Plaintiffs through the interstate transportation system, along with the gas of other ECA lessors in the same vicinity as the nine Plaintiffs. *Id*. Plaintiffs argue that ECA's Vice President of Marketing, Randall Farkosh testified that there are ten transportation agreements total used by ECA to transport ECA's Greene County gas production through the interstate pipeline system. *Id*. Mr. Farkosh testified further that each of the ten

transportation agreements is used to transport gas from a different point in Greene County at which ECA delivers gas into the interstate pipeline system. *Id.* Mr. Farkosh testified that the single transportation agreement it produced in discovery is used to transport 50,000 dekatherms (i.e., 50,000 cubic feet) of natural gas through the interstate pipeline system every day, a fact confirmed by the transportation agreement itself. *Id.* The royalty check stubs of the nine named Plaintiffs show that the aggregate production of the wells of the nine named plaintiffs is far less than 50,000 dekatherms per month. *Id.* According to the Sample Check Stub for Stuart Whipkey for Royalty payment for September 2010 showed production of 1385 dekatherms of gas for that month. *Id.* Thus, only a small portion of the 50,000 dekatherms transported each day under the referenced transportation agreement is produced from the properties of the nine named Plaintiffs, meaning that ECA transports the gas of many other lessors in addition to the nine named Plaintiffs under the one transportation agreement alone. *Id.* Because this single transportation agreement is only one of ten transportations agreement used to transport ECA's Greene County gas production through the interstate system and since Greene County accounts for only 8% of ECA's gas wells state-wide, as shown by the DEP report, Plaintiffs argue there are clearly vastly more than forty ECA lessors in Pennsylvania whose gas is transported through the interstate pipeline system. *Id.*

Plaintiffs' cited evidence is enough circumstantial evidence to find that it is more likely than not that more than forty class members were charged transportation charges prior to March 26, 2012 and that joinder of all class members would be impractical. Plaintiffs do not assert that the DEP report shows how many leases were entered into pre-March 26, 2012, the operative date for interstate transportation and marketing costs claims. It is also unclear from the face of the

DEP report whether the "permit issued date" operates as the date the lease was executed.[3]

Plaintiffs' assertion that oil and gas leases usually have two lessors is wholly unsupported by the evidence, except for Plaintiffs pointing to their own leases. However, the evidence otherwise shows that it is more likely than not that subclass one consists of more than forty members. Plaintiffs need not show a precise calculation of the members in the class. Given the total number of ECA leases in Pennsylvania, the amount of gas transported into the interstate system compared with the Royalty Check Stubs, and the ten transportation agreements in Pennsylvania, it is more likely than not that over forty lessors were allegedly improperly deducted interstate transportation charges during the operative time frame. Therefore, numerosity has been satisfied.

### ii. Commonality

To prove commonality under Rule 23, "the plaintiff . . . [must] demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart*, 131 S.Ct. at 2551. The injury alleged "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "What matters to class certification . . . is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* (citations and internal quotation marks omitted) (emphasis in original). A plaintiff does not meet the commonality requirement by merely alleging "systemic violations of the law." *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195 (10th Cir. 2010). Rather, the plaintiff must prove "a

---

[3]     It is likely that the "permit issued date" is not the date the leases were executed considering the report states that the Vecchio lease had a permit date issued April 8, 2008 and April 18, 2008 and from the record, the actual lease was executed on March 13, 2006.

discrete legal or factual question common to the class . . . exist[s]." *Id.*

Plaintiffs allege that each member of subclass one has suffered the same injury, *i.e.*, the deduction of interstate transportation charges incurred after the gas was sold and that there are common questions of law and fact among all class members. Pls.' Obj. [ECF No. 135] at 10. Specifically, Plaintiffs allege that the common question of law is "whether Pennsylvania law allows a gas producer to deduct costs incurred after it has sold the gas" and the common question of fact is "whether ECA deducted interstate pipeline charges from royalties, and, if so, whether ECA held title to the gas when those interstate pipeline charges were incurred." *Id.* at 10. Plaintiff also argues that it is possible to answer these questions through common proof because "ECA's records establish whether transportation charges were deducted from a lessor's royalties prior to March 26, 2012 and the O'Malley Declaration establishes that ECA did not have title to the gas when the transportation charges were incurred prior to that date." *Id.* at 10-11.

ECA argues that the royalty provisions of the proposed class "differ in ways that are critical to the . . . transportation claim[.] Leases executed in 2007 and later expressly permit ECA to deduct . . . transportation costs associated with the sale of gas regardless of whether those costs were incurred by ECA, its affiliate or a third party. Accordingly, putative class members with royalty provisions that include this express authorization do not have a claim that the deduction of . . . transportation costs breached their lease." Def.'s Resp. to Obj. [ECF No. 136] at 14. Moreover, "not all of ECA's Pennsylvania lessees [sic] have a claim for interstate transportation costs because ECA has not incurred, and therefore has not deducted, interstate transportation costs on the gas from those wells." *Id.* ECA argues that the "interstate transportation costs at issue were not incurred until ECA contracted with [Columbia Gas] in 2011 for firm transportation from delivery points on the A.C. Neilsen gathering line in Greene

14

County, Pennsylvania[, and therefore a] majority of interstate transportation costs . . . were shared only with those Greene County lessors whose wells connect to the A.C. Nielsen system." *Id*. at 14.

ECA also argues that the Court should apply the reasoning set forth in *Foster v. Apache Corp*., 285 F.R.D. 632 (W.D.Okla. 2012) denying class certification for underpaid royalties on an oil and gas lease because no common questions existed due to the differing royalty provisions in each lease. In *Foster*, the court found that a "lessee's obligations to the mineral owner are determined largely by the terms of the oil and gas lease. . . . [Thus,] in determining the nature and extent of the obligation to pay the royalty, the terms of the particular lease must be examined." *Id*. at 641. Further, because the defendant had over ten thousand leases applicable to the interests of the proposed class, with differing royalty clauses, "the leases create what are, in at least some instances, varying or arguably varying royalty obligations. As a result, [defendant's] common practice of paying all royalties in a common fashion may violate some leases but not others." *Id*. at 642. *See also Morrison v. Anadarko Petroleum Corp*., 280 F.R.D. 621, 625 (W.D.Okla. 2012) ("The dissimilarities amongst the putative class members' oil and gas leases impedes the generation of common answers. In other words, the central issue of whether [defendant] underpaid royalties cannot be resolved 'in one stroke' because the varying terms regarding royalty valuations amongst plaintiff's and putative class members' leases will generate different answers based upon the particular lease.").

*Foster* is distinguishable in the instant case. *Foster* turned on the question of what obligations the royalty provisions imposed on the gas company. In this case, as explained in greater detail *infra*, the question turns on the relationship between ECA and EMCO and the ownership of the gas. By operation, the Court would not have to parse through each royalty

provision to determine the legal obligations they create. Thus, *Foster* does not apply.

Additionally, ECA's arguments are misplaced. First, its contention that leases that permit the deduction of transportation costs associated with the sale of gas regardless of whether ECA, EMCO or a third-party incurred them does not absolve ECA from liability under this claim. These lease provisions do not permit ECA to deduct transportation costs post-sale, and under *Kilmer*, such post-sale deductions are not proper. Second, ECA's argument that not all gas produced is transported interstate and therefore ECA does not deduct interstate transportation charges is also misplaced. If the lessor's gas did not incur transportation charges, those lessors, by definition, would not be members of the proposed class.

Although both of ECA's arguments fail, the Court must still conduct a rigorous analysis to determine whether Plaintiffs' claim for the wrongful deduction of transportation charges can be determined through common proof. There are undeniably common questions of fact and law that pertain to subclass one. Plaintiffs argue that ECA sold all of its gas to its subsidiary, EMCO at the delivery points into the interstate pipeline system. Therefore, ECA never incurred interstate transportation charges because it sold the gas to EMCO who then transferred it to the interstate pipeline system. EMCO incurred the interstate charges and ECA improperly deducted those interstate transportation costs from lessors' royalties. This claim can be shown by common proof. If Plaintiffs prove that when ECA transferred the gas to EMCO, EMCO in fact held title to the gas upon the point of transfer, any transportation charges incurred post-sale would constitute a breach of the lease for wrongfully deducted charges regardless of the lease form. ECA merely must show in order to not be liable for a breach of the leases that it deducted the interstate costs prior to the sale of gas to EMCO. There are common answers that can be illustrated through common proof, therefore, subclass one has met the requirements of

commonality.

      iii.   <u>Typicality</u>

To determine whether typicality is satisfied, the Court must assess "whether 'the named plaintiff[s'] individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'" *Johnston*, 265 F.3d at 184 (quoting *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985)).  Typicality certifies that the putative class members' and class representatives' interests "are aligned 'so that the latter will work to benefit the entire class through the pursuit of [their] own goals.'" *Newton*, 259 F.3d at 183 (quoting *Barnes v. American Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998)).  Typicality is satisfied "when the named plaintiffs and the proposed class members 'challenge [ ] the same unlawful conduct . . . . Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Thomas v. SmithKline Beecham Corp.*, 201 F.R.D. 386, 394 (E.D.Pa. 2001) (quoting *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994)).  Total "factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of other class members will be fairly and adequately protected in their absence." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009).  A court uses the following analysis to determine whether the named plaintiffs are markedly different from the class as a whole:

> (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and

incentives of the representative must be sufficiently aligned with those of the class.

*Marcus*, 687 F.3d at 598 (internal quotations and citations omitted).

In support of Plaintiffs' claim that typicality is satisfied, Plaintiffs summarily argue that "[t]he claims of the named plaintiff and the class are the same both in terms of the facts and law, the named plaintiffs are not subject to unique defenses, and the interests and incentives of the named plaintiffs are sufficiently aligned with those of the class." Pls.' Br. in Supp. of Mot. for Class Cert. [ECF No. 107] at 11. Plaintiffs offer no evidence to support its assertion.

ECA argues that because there are different lease provisions among the putative class, they do not share identity of claims among the class. It argues:

> Because the named Plaintiffs and the potential class members have different lease provisions that govern their breach of contract claims, they cannot all assert the same claims or allege entitlement to the same items of damages. Some of the named Plaintiffs and class members have leases that expressly permit ECA to deduct the marketing expenses and transportation costs that are the subject of two of the remaining claims.

Def.'s Br. in Op. to Mot. for Class Cert. [ECF No. 121] at 16. Although ECA argues that unique defenses exist, it fails to point out what those defenses are. *Id.* ECA recycles the same argument to negate typicality that it uses for commonality. Specifically, because potential class members have differing lease provisions that permit ECA to deduct the transportation costs, the class members have differing factual and legal positions. However, as explained *supra*, because it only matters whether these charges were incurred post-sale, ECA's argument is rejected.

The transportation charges claim is typical between the named Plaintiffs and the putative class. Both assert that all post-sale interstate transportation charges deducted from royalties constitutes a breach of the lease, therefore the legal theory advanced is typical of the class; the factual circumstances underlying the claim is typical, because it hinges on the relationship

between ECA and its subsidiary EMCO; ECA has not identified any tenable defenses it could raise to any one individual class member that is likely to become the focus of the litigation; and the interests and incentives of the named Plaintiffs are aligned with the class because resolution of the named Plaintiffs' transportation charges claim would dispose of the claim as a class. Plaintiffs have illustrated that subclass one satisfies typicality.

     iv.    <u>Predominance</u>

After a court determines that the factors of Rule 23(a) are met, it must conduct an analysis under Rule 23(b)(3) to determine whether common issues of fact or law predominant over individual claims of the class. The predominance factor determines whether the putative class is "sufficiently cohesive to warrant adjudication by representation, a standard far more demanding than the commonality requirements of Rule 23(a), requiring more than a common claim." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311 (internal citations and quotations omitted). The Court of Appeals for the Third Circuit has explained:

> Issues common to the class must predominate over individual issues. Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case. If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable.

*Id.* "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)" because the court must consider factual inquiries as to whether common questions predominate over individual ones. *Comcast*, 133 S.Ct. at 1432. "Whether a particular issue is 'common' or 'individual' depends on the nature of the evidence necessary to resolve the issue. Therefore, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Gates*, 265 F.R.D.

at 219-220 (internal citations and quotation marks omitted). The plaintiff must "demonstrate that each element is capable of proof at trial through evidence that is common to the class rather than individual to its members. In other words, the elements of the claims must be examined through the 'prism' of Rule 23." *Id*. Although a plaintiff is not "required to prove the elements of their claims at the class certification stage[,]" the court must consider the elements of the claim through the predominance factor "to determine whether they are capable of proof with common, class-wide evidence." *Hernandez*, 2013 WL 2245894, at *7 (quoting *Marcus*, 687 F.3d at 600 (internal quotations omitted)). In doing so, the court must make a "rigorous assessment of the available evidence." *In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d at 312.

Plaintiffs argue that the common questions that predominate are "whether Pennsylvania law allows a gas producer to deduct costs incurred after it has sold the gas, whether ECA deducted interstate pipeline charges from the royalties and, if so, whether ECA held title to the gas when those interstate pipeline charges were incurred." Pls.' Obj. [ECF No. 135] at 14. Moreover, Plaintiffs invoke the discovery rule to extend the damage period back to the first royalty payment under each lease. *See* Pls.' Br. In Supp. of Mot. for Class Cert. [ECF No. 107] at 14. The Court respectfully recommends that the discovery rule should not be applied and will discuss the reasons *infra*.

ECA responds that common issues do not predominate because although "ECA may use the same general methodology to calculate royalties – i.e., under the net proceeds leases, royalty owners are paid the sale price of the gas less applicable post-production costs[,] . . . [the transportation claim] depends on the language of the lessor's lease and whether the particular costs were incurred and allocated to him in calculating his royalty." Def.'s Resp. to Obj. [ECF No. 136] at 20.

The elements for a breach of contract under Pennsylvania law are "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Axis Specialty Ins. v. Brickman Grp.*, 458 Fed.App'x 220, 224 (3d Cir. 2012) (citations omitted). Plaintiffs argue that "[t]hese elements can be proven here through common proof because ECA calculates the royalties on all of its Pennsylvania royalty owners using the same methodology." Pls.' Br. in Supp. of Mot. for Class Cert. [ECF No. 107] at 14. Moreover, Plaintiffs argue that no lease allows ECA to deduct interstate pipeline charges incurred post-sale. *Id*.

The Court agrees that common issues predominate in the claim for interstate transportation costs. Plaintiffs can prove the existence of a contract through the leases, a breach by a finding that EMCO owned title to the gas, incurred the transportation charges and ECA deducted those charges from royalty payments, and damages through the amount deducted. Therefore, predominance has been satisfied as to the interstate transportation charges claim.

v.     <u>Superiority</u>

Under Federal Rule of Civil Procedure 23(b)(3), in addition to predominance, a class must be the superior means of fairly and efficiently adjudicating a controversy when compared with other available means. *See* Fed. R. Civ. P. 23(b)(3). The court must consider the following:

> (A) the class members' interests in individually controlling the prosecution or defense of separation actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Plaintiffs argue that no individual actions have been filed on these claims, there are no competing class actions, the Western District of Pennsylvania is a proper venue because

plaintiffs residing in Greene County and 60% of ECA's 1,623 Pennsylvania wells are in the counties allotted to the Pittsburgh Division of the Western District of Pennsylvania.[4] Pls.' Br. in Supp. of Mot. for Class Cert. [ECF No. 107] at 16. Further, Plaintiffs argue that it would be difficult for class members to bring individual actions due to the prohibitive costs of litigation and individual suits could result in inefficient administration of justice and possibly inconsistent judgments. *Id.* ECA offers no meaningful rebuttal to Plaintiffs' assertions. The Court agrees with Plaintiffs' reasoning and finds that the class action mechanism is a superior means to adjudicate the claim under subclass one. Therefore, because Plaintiffs have demonstrably shown that subclass one is proper for class certification, it is respectfully recommended that subclass one be certified as a class.

### c. Subclass Two: Improperly Deducted Marketing Fees from Royalties After the Gas was Sold

Subclass two consists of all Pennsylvania lessors holding an oil and gas lease with ECA (or EMCO) that ECA deducted marketing fees from the royalties prior to March 26, 2012. As to Plaintiffs' claim for deducting incurred marketing costs from their royalties, Plaintiffs allege:

> Prior to March 26, 2012, ECA incurred no marketing costs because it sold all of its gas to a single buyer. As stated in the Declaration of George O'Malley, ECA's Vice President of Accounting:
>
>> ECA sells gas produced from the wells under plaintiffs' leases to Eastern Marketing Corporation ("EMCO"), a subsidiary of ECA, which in turn sells the gas to third parties under gas purchase agreements. Although for credit assurance purposes some of the gas sales contracts with third parties are in the name of ECA and EMCO, the contracts are considered EMCO contracts and

---

[4] For example, Plaintiffs state: "ECA's 1,623 wells are located in the following counties: Indiana (495); Clearfield (407); Erie (214); Greene (208); Armstrong (159); Jefferson (91); Westmoreland (18); Warren (11); Centre (10); Cambria (4; Fayette (4) and Allegheny (2). Thus, 997 or (60.2%) of ECA's Pennsylvania wells are in counties within the Pittsburgh Division (Indiana, Greene, Armstrong, Jefferson, Westmoreland, Fayette and Allegheny)." *See* Pls.' Br. in Supp. of Mot. for Class Cert. [ECF No. 107] at 16 n. 11.

> EMCO performs all obligations and assumes all risk of performance as the seller of the gas under the contracts.
>
> Notwithstanding that ECA sold the gas to a single buyer -- and therefore incurred no marketing costs -- ECA deducted a "marketing fee" from the royalties.

Pls.' Br. in Supp. of Mot. for Class Cert. [ECF No. 107] at 6-7 (emphasis in original) (citations omitted).

In response, ECA argues that the deduction of marketing costs were proper because it did not incur those marketing costs prior to the sale of the gas. Def.'s Resp. to Obj. [ECF No. 136] at 5.

The Court previously denied summary judgment as to this claim. *See* Rep. and Rec. [ECF No. 92] at 23; Memo. Order [ECF No. 103] at 10-11. The Court stated in pertinent part:

> Whether the marketing fee is chargeable to the Plaintiffs depends upon which entity actually incurs the marketing costs and requires an analysis of the legal relationship between ECA and EMCO. . . . Plaintiffs maintain that because the marketing costs are incurred after ECA sells the gas, those costs are chargeable to EMCO's third party purchaser clients and not to them. . . . ECA responds that, since it is undisputed that it incurs the marketing fees, these costs are included in the category of post-production costs encompassed by the definition of royalty and can be subtracted from the proceeds payable to the Plaintiffs from the sale of gas. . . . [T]he nature of the transactions governed by the contract is itself ambiguous. While the Gas Purchase/Sales Contract describes EMCO as the buyer of the gas, it also provides that EMCO never holds title to the gas. . . . [Also,] there is a dispute regarding whether the post-formation behavior of the parties constituted an oral modification of the contract. The Court cannot conclude that either party is clearly entitled to a judgment as a matter of law and recommends that both ECA's and Plaintiffs' Motions for Summary Judgment be denied on the marketing costs issue."

Rep. and Rec. [ECF No. 92] at 20-23. Denying the parties' objections to the contrary, the District Court held "[t]he court concurs that the unresolved questions of fact concerning the

relationship between ECA and its subsidiary, EMCO, and which of these entities incur the marketing costs, preclude summary judgment on this issue." Memo. Order [ECF No. 103] at 9.

For the following reasons, the Court finds that each factor of Rule 23 with respect to subclass two and respectfully recommends that subclass two be certified.[5]

i.  Numerosity

Plaintiffs argue that the evidence supports a finding that the class is sufficiently numerous in that there are vastly more than forty class members from whose royalties ECA deducted marketing fees. Plaintiffs submit the following evidence in support of numerosity:

> EMCO issues a separate Gas Control Statement for each point into the interstate pipeline system at which it received the gas from ECA for subsequent re-sale to EMCO's third-party purchasers. EMCO produced . . . a very limited subset of its Gas Control Statements. The subset is limited to gas that it purchased from ECA at two points where the gas enters the interstate pipeline system. ECA produced the Gas Control Statements for these two points because these are the points at which the gas from the nine representative plaintiffs (and some of its other Greene County lessors) was sold to EMCO. The two receipt points are meters 640569 into the interstate pipeline system of Columbia Gas Transmission, LLC ("Columbia") and meter 73465 into the interstate pipeline system of Texas Eastern Transmission L.P. ("Texas Eastern").

> The most recent Gas Control Statement produced by ECA are the Gas Control Statements for September 2011. The Gas Control Statement for Columbia meter 640569 shows that EMCO billed ECA $216,156.00 in marketing fees for the gas that entered the Columbia system at that meter point. The Gas Control Statement for Texas Eastern meter 73465 shows that Texas Eastern billed ECA $241,935.20 in marketing fees for the gas that entered the Texas Eastern system as that meter point. Thus, EMCO billed ECA $458,091.20 in marketing fees for gas that ECA delivered to just two of the many interstate receipt meters in Greene County.

---

[5]     The Court will not reiterate the standards of each of the Rule 23 factors because they are set forth in subclass one. Rather, the Court will only discuss the tenable legal analysis of each factor as it applies to subclass two.

ECA produced gas in twelve Pennsylvania counties, with Greene County having only 8% of the Pennsylvania wells. It is undisputable, therefore, that ECA deducted marketing fees from the royalties of far more than the nine named plaintiffs. The named plaintiffs have shown by a preponderance of the evidence that there are more than [forty] class members from whose royalties ECA deducted marketing fees. Further, the O'Malley Declaration [ECF No. 106-3] establishes that, prior to March 26, 2012, these [marketing] charges were incurred after ECA sold the gas and therefore were not deductible from the royalties under *Kilmer*.

Pls.' Obj. [ECF No. 135] at 15-16.

ECA responds that numerosity is not satisfied because Plaintiffs "offer no evidence of the number of potential class members who have been charged the marketing fees or whose leases prohibit that charge." Def.'s Resp. to Obj. [ECF No. 136] at 11.

The Court finds that Plaintiffs have shown that it is more likely than not that there are more than forty members of the proposed class who have had marketing fees deducted from their royalty payments, and that joinder of all of the parties would be impractical. In absence of direct evidence, the Court may use circumstantial evidence to find numerosity. Only a purported 8% of the marketing fees that EMCO billed ECA in September 2011 alone totaled $458,091.20. If Plaintiffs can prove their claim that the marketing costs were improperly deducted, it is likely that more than forty lessors in Pennsylvania had marketing costs deducted before March 26, 2012 from their royalties. Taking into consideration the large amount of marketing fees paid to EMCO on only 8% of its Pennsylvania wells and the entire amount of active wells in Pennsylvania, it is more likely than not that the class exceeds forty members and joinder of all would be impracticable. Therefore, subclass two is sufficiently numerous.

ii.    <u>Commonality</u>

Both parties use significantly the same argument as was addressed in the claim for interstate transportation charges and apply it to the claim for improperly deducted marketing costs.  Specifically, Plaintiffs argue that subclass two satisfies commonality because "none of the ECA leases allow ECA to deduct marketing costs post sale." Pls.' Obj. [ECF No. 135] at 16. ECA responds that Plaintiffs have not shown commonality because leases executed post-2007 expressly permit ECA to deduct marketing and transportation costs associated with the sale of gas whether the costs were incurred by ECA, EMCO or a third party. Def.'s Resp. to Obj. [ECF No. 136] at 14.

ECA's argument is again, incorrect.  The fact that some of the leases expressly permit ECA to deduct marketing costs as outlined above does not allow ECA to deduct marketing costs incurred post-sale.

The Court finds that commonalty is satisfied.  There is a remaining question of fact as to the relationship between ECA and its subsidiary, EMCO, and which of these entities incur the marketing costs answers the question of whether those costs were properly assessed to the Plaintiffs.  This unresolved question is common to the entire class and its answer automatically resolves the issue class-wide.   Therefore, subclass two satisfies commonality.

iii.    <u>Typicality</u>

The parties' arguments for and against a finding that subclass two satisfies typicality are identical to that of subclass one and need not be reiterated herein.  The Court finds that the marketing cost claim is typical between the named Plaintiffs and the putative class.  Both assert that any post-sale marketing charges deducted from royalties constitutes a breach of the lease, therefore any legal theory advanced is typical of the class; the factual circumstances underlying

the claim is typical because it depends on the interpretation of the relationship between ECA and EMCO; ECA again has not identified any tenable defenses likely to become the focus of the litigation; and the interests and incentives of the named Plaintiffs' marketing charges claim are the same, as it would dispose of the claim class-wide. Therefore, the marketing cost claim is typical of the class.

        iv.      <u>Predominance</u>

Because the factors of Rule 23(a) are met for subclass two, the Court will address whether the class raises common questions that predominate over the class.

Again, the parties' arguments as to the marketing claim are identical to that of the transportation charges claim, *i.e*., Plaintiffs argue that no lease allows ECA to deduct marketing charges incurred post-sale, and ECA argues that the Court need review each lease to determine whether the particular costs were incurred and allocated to each Plaintiff in calculating his royalty.

For the same reasons that the transportation charges claim has common issues that predominate, the Court finds that the marketing costs claim also satisfies Rule 23(b)(3). The Plaintiffs can show the existence of a contract through the executed oil and gas leases, a breach of the lease by a finding that the marketing costs are incurred after ECA sells the gas and damages through the amount deducted from the royalty payments. Therefore, predominance has been satisfied as to the marketing charges claim.

        v.      <u>Superiority</u>

For the same reasons that class certification is proper for subclass one, the Court finds the class action mechanism is also a superior means of adjudicating subclass two. Therefore, because Plaintiffs have shown that subclass two has met the factors of Rule 23(a) and 23(b)(3), it

is respectfully recommended that the class be certified.

### d. Subclass Three: Unpaid Royalties on Gas Used as Plant Fuel Off of the Leased Premises

Subclass three consists of all Pennsylvania lessors holding an oil and gas lease with ECA (or EMCO) that ECA failed to pay a royalty on gas used as plant fuel off the leased premises.

As to Plaintiffs' claim for gas used off of the leased premises without paying lessors a royalty, Plaintiffs allege:

> ECA's leases in Pennsylvania provide that ECA may use gas free of royalty if the gas is used for operations "on" the leased premises (or "of" the leased premises, the functional equivalent). Gas used for operations of the leased premises, known as "plant fuel" in the industry, is subject to royalty, absent lease language to the contrary. . . . First ECA Midstream LLC, a gathering company, transports the gas from the leased premises to the interstate pipeline system. The gathering agreement provides that the gathering company will provide "gathering, compression and dehydration" services. The gathering agreement provides further that the gathering company "shall receive quantities of Gas from ECA at Point(s) of Receipt on the Gathering Systems and shall deliver thermally equivalent quantities, less Retainage, to or for ECA at the interconnection(s) of the Gathering System with the downstream Transporter(s); . . ." The gathering agreement defines "Retainage" as "the sum of compressor fuel, line loss, dehydration, fuel, or lost or unaccounted-for gas, generally expressed as a percentage of Gas delivered at the Point(s) of Receipt." ECA pays no royalty on the retainage because, for royalty purposes, each well is credited its pro rata share of the gas sold at the interconnect points with the interstate pipelines based on each well's share of the aggregate production measured at the wells. The retainage on which no royalty is paid is sometimes as much as 25% of the gas produced at the well. ECA breached the leases by failing to pay a royalty on plant fuel because the leases only allow for the royalty free use of gas when the gas is used for operations on the leased premises.

Pls.' Br. in Supp. of Mot. for Class Cert. [ECF No. 107] at 7-8 (citations omitted).

ECA argues that "the royalty provision, not the free use clause, governs payment of royalty and that gas used to fuel compressors is a post-production cost properly allocated to all."

Def.'s Resp. to Obj. [ECF No. 136] at 6. Moreover, ECA argues that because the leases differ in language, with some providing for free use of gas for operations "of" the premises and "on" the premises, it creates different legal obligations. Def.'s Br. in Op. to Mot. for Class Cert. [ECF No. 121] at 6. Further, ECA argues that not all of the gas in Pennsylvania is compressed, and consequentially there is no gas taken into account when calculating the royalties. *Id*.

Contrary to Plaintiffs' argument that this claim has not been decided by the Court, the Court denied summary judgment as to this claim. *See* Rep. and Rec. [ECF No. 92] at 28; Memo Order [ECF No. 103] at 10-11. The Court found, in pertinent part:

> *Kilmer* forecloses Plaintiffs' recovery for gas that is unaccounted for or lost between extraction and the point of sale . . . despite both parties' representations to the contrary, it has not specifically addressed the issue of whether ECA's use of gas off the leased premises constitutes a breach of the leases. . . . Gas used to fuel compressors and dehydrators is neither lost nor unaccounted. It remains to be decided if ECA's allocation methodology regarding gas usage off the premised breaches the leases. . . . The Court agrees with Plaintiffs that the leases do not provide that ECA has free use of gas from the wells off the premises. ECA does not respond to this argument, citing its interpretation of the Court's prior recommendation on lost and unaccounted for gas. Given the misunderstanding . . . the Court cannot fairly adjudicate it at this juncture and recommends that summary judgment be denied.

Rep. and Rec. [ECF No. 92] at 28-29; Memo. Order [ECF No. 103] at 10-11. For the following reasons, the Court finds that subclass three does not meet the Rule 23 factors and respectfully recommends that the certification be denied as to this class.

i. Numerosity

Plaintiffs argue that the following evidence supports a finding that subclass three is sufficiently numerous:

> ECA uses an outside firm, Gas Analytical Services, Inc., to (1) measure the gas produced by each ECA well, (2) measure the aggregate gas of all wells feeding into the same receipt point on the

interstate pipeline system, and (3) allocate back to each well its pro rata share of that aggregate gas. Steve Sly, the President of Gas Analytical Services, testified in his deposition in this case that the amount of gas allocated back to each well is less than the amount of gas produced at the wellhead because some gas is lost through leaks in the system and some is used to fuel compressors on the gathering system that carries the gas from the wellhead to the interstate pipeline system. *See* Sly Dep [ECF No. 83-3] at 20. Gas Analytical Services provides ECA with monthly Gas Allocation Statements. *See* Gas Allocation Statements [ECF No. 106-7]. The Gas Allocation Statements report the amount of gas that is used to fuel some of the larger compressors on ECA's gathering system.

ECA produced . . . the Gas Allocation Statements for the two points at which the gas from the properties of . . . eight of the named Plaintiffs (and some other ECA lessors in Greene County) feed into the interstate pipeline system. The two points on the Gas Allocation Statements are the same two points in the Gas Control Statements above in connection with subclass 2: Columbia meter 640569 and Texas Eastern meter 73465. The Gas Allocation Statements include the amount of gas used as compressor and dehydrator fuel. The two most recent Gas Allocation Statements produced by ECA were for April of 2011 and May of 2011. The Allocation Statement for April of 2011 shows that a total of 31,960 thousand cubic feet (mcf) of gas was used as compressor or dehydrator fuel at the Henderson, Cumberland and Vecchio compressor stations. The Gas Allocation Statement for May of 2011 shows that a total of 41,451 mcf was used as compressor or dehydrator fuel at these three compressor stations.

ECA redacted from these reports the line item information for all wells except those of the eight named Plaintiffs. The extensive amount of redactions shows that the line item information of over 200 wells was redacted, leaving only the line item information for the eight named Plaintiffs whose well[s] are included in the statements.

The allocation information on the statements shows that the gas used for compressor and dehydrator fuel was deducted on a pro rata basis from the production of each well's individual production (the "field volume"). The April and May statements show, therefore, that there are easily over 200 class members in sub-class 3 from just two interstate receipt points in Greene County alone.

ECA produces gas in twelve Pennsylvania counties, with Greene County having only 8% of all of its Pennsylvania wells. It

> is undisputable, therefore, that ECA failed to pay a royalty on gas used off premises as compressor and dehydrator fuel when paying the royalties of more than 40 royalty owners.

Pls.' Obj. [ECF No. 135] at 19.

ECA argues that subclass three does not satisfy numerosity because the evidence that there are 200 wells from redaction lines is merely speculative and "Plaintiffs offer no evidence whatsoever to tie these assumed wells to the alleged claim for gas used off premises." *Id*. at 11.

The Court finds that there is enough circumstantial evidence to show that subclass three is sufficiently numerous. ECA argues that not all of the gas in Pennsylvania was compressed, therefore it did not deduct compression fees from the royalties. If ECA's argument was correct, then those wells would not be included in the gas allocation statements which specifically show how much gas was compressed. It is more likely than not that there were more than forty members whose gas was used off of the leased premises. There are only three compressor stations that service approximately 200 wells only in Greene County which account for only 8% of the wells in Pennsylvania. Therefore subclass three is sufficiently numerous.

## ii. Commonality

In support of commonality, Plaintiffs merely state that the common question of subclass three is "whether ECA breached the leases by paying no royalty on gas used as plant fuel off [of] the [leased] premises. Pls.' Br. in Supp. of Mot. for Class Cert. [ECF No. 107] at 10.

ECA claims that

> not all Pennsylvania lessors have a claim for gas used off premises as compression fuel. First, only lessors whose gas is subject to compression would even potentially have such a claim. Not all of the gas that ECA produces in Pennsylvania is subject to a compression, and lessors whose gas is not compressed do not share in that cost. Second, because this claim is premised on ECA's alleged breach of the free use clause, the differing language of that clause in the leases may determine whether a particular lessor has a

claim. Specifically, as Plaintiffs' acknowledge, some of the free use clauses permit the free use of gas "for drilling and production operation *of the leased premises*," whereas other leases permit the free use of gas for operations "*on* the premise." Plaintiffs' argument that the free use clause limits the use of gas to that which occurs physically "on" the leased premises only applies, if at all, to leases with the latter wording. Plaintiffs with free use clauses that permit the free use of gas for operation "of the leased premises," in contrast, would not have a claim for royalties on gas used for compression.

Def.'s Resp. to Obj. [ECF No. 136] at 14-15 (internal citations omitted).

The claim under subclass three cannot be proven through common proof, therefore it fails the commonality factor of Rule 23. The Gas Allocation Statements do not show that the gas was used off of the leased premises, and Plaintiffs have not shown how they can prove that each purported class members' gas was used off-premises through common proof. The Court would have to conduct an individualized inquiry into the location of each well, the production of gas at that well, whether the gas was used as plant fuel, where the plant fuel was used, and whether it was used on the leased property.

Moreover, the "retainage" which Plaintiff claims is what ECA failed to pay royalty on encompasses, by definition, compressor fuel, line loss, dehydration fuel or lost or unaccounted for gas. It has been determined that Plaintiffs do not have a claim for line loss or lost or unaccounted for gas and it is unclear how Plaintiffs can show without pouring through each wells' production history and royalty payments how the retainage is separated into the amounts of gas used for plant fuel and the amounts that are allocated to the permissible uses. Therefore, the Court finds that because Plaintiffs cannot prove through common evidence a breach of the lease for the failure to pay royalties, commonality is not satisfied.

### iii. Typicality

Although the legal theory advanced is the same throughout the class, the factual

circumstances underlying that theory are individual to each member in the class. Therefore, the class representatives' interests are not aligned with those of the class. Moreover, some Plaintiffs are subject to a defense that is inapplicable to many members of the class. ECA argues that the "of the leased premises" lease language allows ECA to not pay royalties on gas used off of the premises. This defense would not apply to all of the class members and is likely to be a main focus of subsequent litigation. If the leases that contain the provision "of the leased premise" specifically encompass the free use of gas off of the leased premise, the class could contain members who do not have a claim for royalties. Therefore, the claims of the named Plaintiffs are not typical of the class and typicality is not satisfied.

### iv. Predominance

Because there are no common answers apt to drive the resolution of this litigation as to subclass three, the predominance and superiority factors of Rule 23(b)(3) need not be discussed. "It logically follows that if Plaintiffs have failed to satisfy the criteria for showing commonality, they cannot satisfy the more strenuous demands of the predominance analysis." *Lewis v. Ford Motor Co.*, 263 F.R.D. 252, 268 (W.D.Pa. 2009). "[I]f proof of the essential elements of the cause of action required individual treatment, then there cannot be a predominance of 'questions of law and fact common to the members of the class.'" *In re Linderboard Antitrust Litig.*, 305 F.3d 145, 156 (3d Cir. 2002) *cert. denied sub nom Gaylord Container Corp. v. Garrett Paper, Inc.*, 538 U.S. 977 (2003). *See also Hayes*, 2013 WL 3957757, at *8 (not applying Rule 23(b) where Rule 23(a) was not met). Therefore, the Court finds that Rule 23(b)(3)'s requirements as it pertains to subclass three have not been met because the less arduous demands of commonalty has not been satisfied.

### e. Adequacy

Plaintiffs contend that "the named plaintiffs' interests are aligned with the interests of the class because the claims of the named plaintiffs and the class members are the same. In proving their own claims, the named plaintiffs necessarily will prove the claims of the class. Further there are no intra-class conflicts." Pls.' Br. in Supp. of Mot. for Class Cert. [ECF No. 107] at 12.

ECA challenges adequacy for the sole reason that Plaintiffs "fail to show that the class representatives possess the 'minimal degree of knowledge' necessary for adequate class representation." Def.'s Br. in Op. to Mot. for Class Cert. [ECF No. 121] at 17.

The adequacy factor ensures that the class representatives "fairly and adequately protect[s] the interests of the class." Fed. R. Civ. P. 23(a)(4). It "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Beck v. Maximus Inc*., 457 F.3d 291, 296 (3d Cir. 2006) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). This inquiry serves two purposes: (1) to test "the qualifications of the counsel to represent the class[;]" and (2) "to uncover conflicts of interest between named parties and the class they seek to represent." *In re Warfarin Sodium Antitrust Litig*., 391 F.3d 516, 532 (3d Cir. 2004).

Here, the ability of Plaintiffs' counsel to adequately represent the class has not been challenged, therefore the Court will focus on the issue of whether the Plaintiffs are sufficiently competent to adequately protect the interests of the class.

"[T]he substantive competence of the named plaintiff is not part of the [adequacy] inquiry." *Smith v. Life Investors Ins. Co. of America*, 2009 WL 3756913, at *10 (W.D.Pa. Nov. 6, 2009).

> A class representative need only possess a minimal degree of knowledge to meet the adequacy standard. A proposed

34

representative's lack of particularized knowledge concerning the dispute at issue does not render her inadequate given the fact that she has retained adequate counsel to represent her. . . . The standard for adequacy of the class representative is a low one, requiring only a minimal degree of knowledge. Furthermore, a class representative need not be intimately familiar with the legal theory behind his claims since he is represented by adequate counsel.

*Id.*

The Court finds that the putative class members are otherwise adequate representatives of the class. A class representative need not be intimately familiar with the legal theory behind his claims. Plaintiffs have been participating in the proceedings of the case, including answering interrogatories, being deposed, and attending and testifying at the class certification hearing. Although they might not know the complex legal intricacies of their case, Plaintiffs have demonstrated the minimal degree of knowledge necessary to meet the adequacy requirement.

**f. Discovery Rule**

Plaintiffs seek to invoke the discovery rule to "extend the damage period back the first . . . royalty payment under each lease." Pls.' Br. in Supp. of Mot. for Class Cert. [ECF No. 107] at 14.

Generally, there is a four year statute of limitations for breach of contract claims in Pennsylvania. 42 Pa. Const. Stat. § 5525(a)(1). However, the statute of limitations can be tolled pursuant to the discovery rule where the plaintiff's injury is neither known nor reasonably knowable. *See generally Fine v. Checcio,* 870 A.2d 850, 858 (Pa. 2005). The purpose of the discovery rule is to permit a plaintiff who "has not suffered an immediately ascertainable injury . . . the same rights as those who have suffered . . . an [immediately ascertainable] injury." *Id.* The statute of limitations period "commences when the plaintiff learns that [he] has an injury and its cause." *Wilson v. El Daief*, 964 A.2d 354, 359 (Pa. 2009). Thus, the "salient point giving rise to


its application is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause." *Fine*, 870 A.2d at 858. A party seeking to invoke the discovery rule has the burden of proof to show he exercised reasonable diligence to discover his injury and its cause. *Wilson*, 964 A.2d at 363 (citations omitted). As applied in class proceedings, "possible differences in the application of a statute of limitations to individual class members, . . . does not preclude certification of a class action" where the statute of limitations is an applicable defense. *Hoxworth v. Binder, Robinson & Co.*, 980 F.2d 912, 924 (3d. Cir. 1992). The reasonable diligence standard is "sufficiently flexible . . . to take into account the difference[s] between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." *Fine*, 870 A.2d at 858.

ECA argues that the Court cannot apply the discovery rule because it requires the "very type of individualized inquiry that precludes class certification." Def.'s Br. in Opp. of Mot. for Class Cert. [ECF No. 121] at 13. In support of its contention, ECA argues that each of the Plaintiffs' testimony "demonstrates the differing factual circumstances that will be pertinent to whether each particular class member exercised due diligence, but was nevertheless, 'unable to know of the injury or its cause.'" *Id*. at 14 (citations omitted in original). ECA argues:

> Some of the Plaintiffs examined the statement that they received with their royalty payments and some did not. Ex. B, S. Whipkey Dep. at 20 (read the check stubs); Ex. C, L. Vecchio Dep. at 15 (read statements); Ex. D, B. Vecchio Dep. at 12 (did not look at the statements); Ex. E, P. Christopher Dep. at 16 (read the statements quickly); Ex. F, J. Dibiase Dep. at 22-23 (looked at statements); Ex. G, G. Virgili Dep. at 44-46 (kept detailed notes regarding statements); Ex. H, E. Virgili Dep. at 7 (did not review statements). The Plaintiffs also differ regarding whether they took meter readings of the gas volumes being produced from the wells on their property and what they did with that information. See, e.g., Ex. B, S. Whipkey Dep. at 34-36 (checked meter readings but did not compare them to check stubs); Ex. C, L. Vecchio Dep. at 16 (took meter readings and noticed a difference between readings he

took at the wellhead and the volumes on the statements he received); Ex. G, G. Virgili Dep. at 41-49 (took meter readings and noticed they never matched royalty statements); Ex. H, E. Virgili Dep. at 6-7 (did not take readings); Ex. F, J. Dibiase Dep.at 38 (looked at meter once or twice a week).

*Id.* at 14.

As it pertains to the discovery rule, the Court has already determined that whether the discovery rule applies to extend the statute of limitations is a "factual determination as to whether the party was able, in the exercise of reasonable diligence, to know of his injury and its cause." Rep. and Rec. [ECF No. 92] at 31. The Court agrees with ECA that applying the discovery rule would require the Court to make an individualized inquiry into whether each Plaintiff exercised reasonable diligence to know that they were injured. Some named Plaintiffs took meter readings and compared the readings to their check stubs, some did not, and some noticed that the readings never matched the statements. Arguably, this could be enough notice for a reasonably diligent oil and gas lessor to know that ECA was breaching the lease by not paying them their share of royalties. It would be impossible for the Court to make this determination on a class-wide basis, therefore, it is not appropriate to apply the discovery rule in this case, and subclasses one and two will be limited in temporal proximity to those interstate transportation charges and unincurred marketing costs deducted between the dates of November 22, 2006[6] to March 26, 2012.

## VI.    **CONCLUSION**

As discussed at length above, Plaintiffs have shown that subclass one and subclass two meet the Federal Rule of Civil Procedure 23 factors. It is therefore respectfully recommended that Plaintiffs' Motion to Certify subclass one and two be granted as modified below. Plaintiffs

---

[6]    The instant action was filed on November 22, 2010. Under the statute of limitations for contract actions, Plaintiffs' claims are timely for royalty payments four years prior to the initiation of this action, or November 22, 2006.

have not shown that subclass three deserves the same class treatment, and therefore it is respectfully recommended that Plaintiffs' Motion to Certify subclass three be denied.

Therefore, it is respectfully recommended that the following class be certified:

All lessors on an oil and gas lease with Energy Corporation of America or Eastern American Energy Corporation that conveys oil and gas rights to real property in Pennsylvania and:

> (1) the lessee deducted charges for interstate pipeline services between November 22, 2006 and March 26, 2012 (subclass one); and/or

> (2) the lessee deducted marketing fees from the royalties between November 22, 2006 and March 26, 2012 (subclass two).

## **RECOMMENDATION**

For the aforementioned reasons, it is respectfully recommended that Plaintiffs' Motion for Class Certification [ECF No. 106] be granted in part and denied in part.

It is specifically respectfully recommended that the following class be certified:

All lessors on an oil and gas lease with Energy Corporation of America or Eastern American Energy Corporation that conveys oil and gas rights to real property in Pennsylvania and:

> (1) the lessee deducted charges for interstate pipeline services between November 22, 2006 and March 26, 2012 (subclass one); and/or

> (2) the lessee deducted marketing fees from the royalties between November 22, 2006 and March 26, 2012 (subclass two).

It is further respectfully recommended that class certification be denied for subclass

three.

Parties who seek to challenge this Supplemental Report and Recommendation must seek review by the district judge by filing objections by September 20, 2013. Failure to do so will waive the right to appeal. Any party opposing written objections shall have until September 27, 2013 to respond thereto.[7]

It is also ORDERED that the Report and Recommendation filed on August 5, 2013 [ECF No. 134] is hereby VACATED.

Dated: September 16, 2013

Respectfully submitted,

/s Robert C. Mitchell
Robert C. Mitchell
United States Magistrate Judge

---

[7]     Under LCvR 72(C)(2) pertaining to Objections to a Magistrate Judge's Determination for Nondispositive Pretrial Matters, the Magistrate is permitted to prescribe a different time for objections to be filed. Because the instant Motion has already been objected to, and the parties are familiar with the issues, the expedited time for objections is proper.